city, and called its "corporation counsel," though no such office is provided for by the then charter. His salary is fixed. He is directed by the common council, as corporation counsel, to do certain legal work. He conceives that from its magnitude it is work not contemplated by his original employment and compensation, and puts in a bill for separate or additional payment for this work, which bill is approved and audited by the municipal body charged by law with that duty, and having better knowledge of the extent of the work and its value than any court can get, and which body would be presumed to have in mind the regular employment of plaintiff, the amount of his salary, and the services contemplated for said salary; and no legal disapproval or veto of such audit has been had. It follows that judgment should be ordered for the plaintiff against the defendant for $500, with costs.

Judgment for plaintiff, with costs.

(70 App. Div. 443.)

### CHESTER v. BUFFALO CAR MFG. CO. et al.

(Supreme Court, Appellate Division, Fourth Department. March 11, 1902.)

1. FINDINGS OF COURT—DEPENDENCY UPON OTHER FINDINGS—REVIEW ON APPEAL.

A finding which is a conclusion dependent upon many facts found will not be sustained on appeal if the detailed facts do not support it.

2. TRUSTS—INCREASE OF CAPITAL STOCK—LIFE TENANT—RIGHTS OF REMAINDER-MEN.

Where certain shares of capital stock in a corporation were bequeathed by a testator to his wife for her use and benefit for life, with remainder over to his children, and thereafter the corporation increased its capital stock to represent accumulated surplus earnings actually used in the business, and distributed the new shares among the holders of the original stock, pursuant to an agreement "to increase the capital stock" of the corporation, the new shares constituted capital, and not income, and therefore belonged to the remainder-men, as against the life tenant, or her sole legatee.

3. SAME—LIFE TENANT'S SOLE LEGATEE—FOUNDATION OF CLAIM.

A testator bequeathed shares of corporate stock to his wife for life, with remainder to his children. Testator's son, who was the sole legatee of the life tenant, claimed all shares of stock issued as capital against the accumulated surplus of the corporation, and which were to be distributed proportionately amongst stockholders, both as interested in the testator's estate, as executor of the life tenant's will, and as her sole legatee. *Held*, that the son's claim, if any, to all of the new shares, was derived from the will of the life tenant, making him sole legatee.

4. SAME—LIFE TENANT'S LEGATEE—CONDUCT—ESTOPPEL.

A testator bequeathed shares of corporate stock to his wife for life, with remainder to his children equally. Testator's son, after the life tenant's death, who was the latter's sole legatee, joined in a suit to restrain the testator's executor from selling such shares of stock, together with new shares, representing accumulated surplus, and prayed that all of the shares should be equally divided between the testator's children pursuant to the will. The executor was temporarily restrained, and the children agreed to divide the stock equally. *Held*, that the testator's son was estopped by such agreement from asserting that the new shares of stock, representing accumulated surplus, belonged to the life tenant, as income, and hence to him, as her sole legatee; the mutuality of the agreement furnishing a sufficient consideration therefor, or the agree-

ment constituting a voluntary gift, which, when executed, became irrevocable.

**5. SAME—DISCHARGE OF TESTATOR'S EXECUTORS—EFFECT.**

Testator's children, as remainder-men, by mutual agreement, divided certain shares of stock, together with new shares issued against the accumulated surplus of the corporation. Thereafter a son of the testator joined, as one of the executors, and as a beneficiary under the will, and interested in the estate, in a proceeding for the discharge of the executors on the ground that testator's property had been fully distributed. The surrogate's court discharged such executors, "being satisfied that the executors had duly accounted to all the interested parties for their interests." *Held,* that the court was obliged to determine whether the new shares of stock constituted income, so as to pass to the life tenant, or her sole legatee, or were capital, so as to pass to the remainder-men, and that the court's implied decision that they were capital was binding on the parties to the proceeding, and hence the testator's son was barred from claiming that such new shares were income, and belonged to him as the life tenant's sole legatee.

**6. SAME—KNOWLEDGE OF LIFE TENANT'S LEGATEE—EVIDENCE.**

A testator bequeathed shares of corporate stock to his wife for life, with remainder to his children. Testator's son was one of the executors of the will. He knew the numbers of shares of stock so bequeathed, and their value. He knew that the corporation issued new shares of stock to the estate, and that no assets of the estate were used to pay therefor. He was a party to all proceedings in the settlement of the testator's estate. *Held,* that he was charged with sufficient knowledge to suggest the inquiry whether such new stock issued against accumulated surplus, was income, so as to pass to him as sole legatee of the life tenant, or capital, so as to pass to the remainder-men, and hence his agreement with the other legatees for the equal division of such new shares among themselves, as remainder-men, and a decree in proceedings taken by him determining the stock to be capital, will not be set aside on the ground that the facts were unknown to him.

Williams, J., dissenting.

Appeal from special term, Erie county.

Suit by George T. Chester, individually and as executor of the will of Mary P. Chester, deceased, against the Buffalo Car Manufacturing Company and others. From an interlocutory judgment rendered upon findings of the court in favor of plaintiff, defendants appeal. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Adelbert Moot, for appellants.

Ford & Ferguson, for respondent.

HISCOCK, J. The principal question involved upon this appeal is whether 300 shares of capital stock issued by the defendant car company in January, 1893, against an accumulated surplus, is to be regarded as a dividend, and belonging to the life tenant under a will, or whether it is to be regarded as part of the principal of the estate, and belonging to the remainder-men. There are other questions, but they are minor and incidental to this one. The learned trial justice has found upon the issue above suggested in favor of the life tenant, and plaintiff as her legatee, and against the remainder-men. We are unable, however, to agree with the result thus reached by him. We think the facts found in much detail do not warrant such conclusion,

and that, under the features of this case, it leads to results which are unnatural and inequitable. We think that the stock was not a dividend and income belonging to the life tenant; also that plaintiff is prevented from asserting such claim by reason of certain settlements and surrogate's decrees to which he was a party.

Thomas Chester, the administration of whose estate presents this controversy, died February 18, 1884, leaving, him surviving, his widow, Mary P. Chester, and his children, the plaintiff and the individual defendants. He left a last will and testament, which was duly admitted to probate, and which, so far as is important here, after certain specific legacies not affecting the stock in issue, contained this clause:

"I give, devise, and bequeath, all and singular, the rest, residue, and remainder of my property and estate, both real and personal, unto my beloved wife, Mary P. Chester, for her use and benefit during the full term of her natural life, but no longer."

Then followed remainder in said property to his said four children, to be divided and distributed to and among them equally, share and share alike, upon the death of his wife. And said will appointed the plaintiff and James F. Chard, husband of the defendant Elizabeth Chard, executors thereof. The widow, Mary P. Chester, died February 16, 1897. She left a will, which was admitted to probate September 25, 1897, whereby she appointed plaintiff sole executor, and devised and bequeathed to him the greater part of her property and estate, and expressly including all of her interest in the stock of the Buffalo Car Manufacturing Company. At the time of his death Thomas Chester was the owner of 60 shares of the capital stock of the defendant car company, each share being of the par value of $100, and the total capital stock being $40,000. Said company had only declared one dividend while testator was alive and the holder of its stock, but, as expressly found by the trial court, "a large surplus of earnings had been allowed to accumulate in the operation of said corporation." Its statement or inventory of January 5, 1884 (just before testator's death), showed an accumulated surplus above the original capital stock of $289,341.88. After the testator's death, and down to the death of his widow, the life tenant, it at frequent intervals declared large cash dividends, at first upon the original 60 shares held by testator, and subsequently upon the 360 shares, which included the stock issue in dispute. These dividends were all paid or conceded to belong to the widow, although, as matter of fact, she did make provision whereby a large portion of them were ultimately paid to and enjoyed by her four children. These dividends during the period in question amounted to $93,450. Notwithstanding their payment, it appears that, at the time the stock issue in question was made, the accumulated surplus of the car company was $443,030.57, or $153,688.69 more than at the date of death of the testator. Such amount of increase, however, was subsequently, and during the life of Mrs. Chester, largely distributed and reduced by cash dividends, of which she had the benefit. Said testator left other valuable property, the income of which his widow was entitled to, and consideration of which we do not regard as of importance here. Shortly after his

death the certificate for the original 60 shares of stock standing in his name was surrendered by the executor Chard, and canceled, and a new certificate for said shares issued in form to the estate of Thomas Chester; and, when the additional 300 shares were issued, it was by a certificate running to the estate of Thomas Chester, and delivered to said executor. Prior to, and as authority for, the increase in the capital stock of said car company, upon January 7, 1893, the stockholders therein signed an agreement which recited that they "hereby mutually agree one with another to increase the capital stock of the said company from forty thousand dollars ($40,000.00), consisting of four hundred shares, of one hundred dollars ($100.00), par value, each, to two hundred fifty thousand dollars ($250,000.00), consisting of twenty-five hundred shares, of one hundred dollars ($100.00), par value, each, one hundred shares of which said stock shall be held in the treasury of said company, and be sold by the trustees, as they may decide, to some railroad party, which shall be for the best interests of the company; the balance of the increased stock to be divided pro rata among the stockholders of said company according to their present holdings." This action was followed up by a meeting of the trustees of said car company held January 14, 1893, at which, as specifically found by the trial judge, "the capital stock of the Buffalo Car Manufacturing Company was increased from $40,000, consisting of four hundred (400) shares, of the par value of $100 each, to $250,000, consisting of twenty-five hundred (2,500) shares, of the par value of $100 each; * * * that no new money or property was contributed by any stockholder at the time of said increase of stock." Thereafter the certificate for the 300 shares in question was issued.

There have been various disagreements and controversies between plaintiff and his sisters, the defendants, over the estate of their father. We do not deem it material to go into the details of any of them, except the ones which specially relate to the disposition and division of this stock.

While the will of Thomas Chester did not specifically name and appoint his executors also trustees, they were still treated as such. A fair construction of the will and the administration of the property as between the life tenant and the remainder-men properly called upon them to act as such. In addition to this, by the specific request of the widow, the conduct of the other parties, and the decrees of the surrogate's court, they were upon all sides treated and regarded as trustees as well as executors. The plaintiff at some time transferred all of his interest in his father's estate to his wife, Helen R. Chester. In September, 1897, the executor Chard wrote plaintiff a letter commencing, "You will remember that the estate of Thomas Chester owns three hundred and sixty shares of the capital stock of the Buffalo Car Manufacturing Company," and then stating that, for the purpose of securing an adjustment and settlement of matters as executor and trustee of Thomas Chester, he should offer said stock for sale at public auction at a given date. Thereupon plaintiff's wife, as his assignee, instituted proceedings in the surrogate's court of Erie county setting forth various facts in regard to the death of Thomas Chester, the administration of his estate, the provisions of his will,.

the assignment to her of plaintiff's interest in said estate, and that one of the items of property in the hands of the executors was said 360 shares of the capital stock of the Buffalo Car Manufacturing Company. Her petition then further referred to the receipt of the letter just mentioned from the executor Chard, alleging "that as such assignee of the interest of the said George T. Chester in the estate of his said father, Thomas Chester, she became, and is now, the owner of ninety (90) shares of the said three hundred and sixty (360) shares of the Buffalo Car Manufacturing Company's stock; that she does not desire to have her said ninety (90) shares sold, but wishes to keep same as an investment." Upon her petition she requested that the executors of the will of Thomas Chester be compelled to show cause why they should not deliver over to her "her aforesaid ninety (90) shares of the capital stock of the Buffalo Car Manufacturing Company," and that in the meantime they might be enjoined. George T. Chester, although having assigned his interest in said estate and stock, joined in his wife's petition, saying "that he has read the foregoing petition of his wife, Helen Reid Chester, and that the same is true; that he desires that the prayer of said petitioner be granted." Upon this petition an order to show cause was granted, and Chard was restrained from selling, disposing of, or incumbering the said 90 shares of stock until the further order of the court. No further proceedings in surrogate's court appear to have been had. An arrangement, however, was made by the parties amongst themselves which resulted in the certificates for the 360 shares of stock being delivered to the company for cancellation, and upon September 30, 1897, four new certificates, of 90 shares each, issued in place thereof to plaintiff's wife and each of the individual defendants herein. After such arrangement and division of said stock amongst said four people, and in November, 1898, upon an acknowledgment signed by the three defendant heirs, and also by plaintiff and his wife, that James F. Chard and George T. Chester, "as the executors and trustees of the will of Thomas Chester, * * * have fully and satisfactorily accounted to us, as the heirs and next of kin of said deceased, fc. all moneys and property held by them as such executors and trustees," and upon the express consent that said Chard and Chester might have a decree made and entered discharging them of and from any and all liability or accountability to his heirs, without further accounting, a decree was duly entered in the surrogate's court of Erie county, upon the petition of said executors, ordering and decreeing that said Chard and Chester should be, and thereby were, "finally released, exonerated, and discharged, as the executors and trustees, of and from any and all liability and accountability to said interested persons." The trial court found that the plaintiff "had no knowledge of the declaration of said stock dividend, nor of the increase of stock, nor of the issuing of said certificate for three hundred (300) shares, * * * and did not know of the increase of said stock until after the death of said Mary P. Chester." Some time before the commencement of this action the car company, having disposed of a part of its business and assets, entered upon a course of liquidation.

Upon these and many other facts, which it is impossible to recapit-

ulate in detail, the learned trial court found that said 300 shares of the new stock "represented and was a payment and distribution of income upon and from the sixty (60) shares of stock of which the said Thomas Chester died possessed and owning at the time of his death." In accordance with such finding of fact, he reached the conclusion of law that plaintiff was entitled to recover from his three sisters the 225 shares of stock delivered to them under the arrangement hereinbefore referred to, and was entitled to have them, and also the car company, account and be held liable for all dividends paid to such sisters, respectively, on such portion of said 300 shares so delivered to them.

As we indicated in the beginning, we do not come to the decision of this appeal with the feeling that there is any strong and predominating equity inherent in plaintiff's claim and theory. And in saying this we overlook entirely its incidental surroundings. We disregard the fact that plaintiff comes as the legatee of the life tenant, whose death has terminated any use or need by her for this property, viewed as income, seeking, through the intervention of her will, to procure, as against his sisters, an unequal distribution of his father's estate. Upon the other hand, we hold ourselves subject to the same equitable consideration which should prevail if the life tenant herself were here seeking for a full admeasurement of the provisions made and intended by her husband for her support during her life. Being so guided, we still think that during her life, without the stock in dispute, there was worked out a liberal fulfillment of the bequest to her of the income upon her husband's stock in this company. Estimated from the dividends declared upon the Chester stock, and the other figures found, the company made earnings and profits during the life tenancy of Mrs. Chester amounting in the neighborhood of $700,000. With her husband's death it apparently entered upon a new policy of distributing in cash dividends amongst its stockholders substantially all of its profits. We thus find that its surplus between his and her death had only increased $72,000. All of the remainder of these tremendous earnings and profits had been distributed in cash, and she had received as her share during the period of 12 years $93,450. That she did not receive still more was due to the accident of her death between two dividend periods, for soon after her decease the company made another cash dividend of 40 per cent. Using round figures, at the time the new stock was issued the surplus of the company was $443,000, of which $153,000 had accumulated after the death of the testator. Assuming, for the sake of the argument, that the new stock is to be deemed issued as against this total surplus, practically two-thirds of it, or 200 shares, would be against that which had accumulated before the death of the testator. If plaintiff's contention prevails, and, in addition to the cash dividends above referred to, the accumulated capital and surplus existing when testator died is distributed in the proportion of 200 shares to the life tenant, as against only 60 shares going to the remainder-men, we believe it must impress the judgment at once as at least an unusual division. While it is subject to modification and variation, the natural and fundamental idea of life income payable under a will is of that current in-

75 N.Y.S.—28

come which accrues and becomes payable from time to time during
the life tenancy, upon a principal fixed as of the time when the trust
took effect, and remaining substantially unchanged. Sometimes the
amount of this principal is fixed by directions for the investment
of a definite sum, and at other times by the appropriation of specified
securities, as bonds or stocks. In the case of the latter, while it may
happen that by means of an extraordinary dividend there will be al-
lotted to the life tenant a certain per cent. of profits which accrued
before his estate commenced, that is the unusual course, rather than
otherwise. We certainly do not expect or readily accept such a solu-
tion between the life tenant and remainder-men, through the medium
of dividends, as will divide a testator's estate as it existed at his death
between the former and the latter in the proportion of three or four
shares to the former for one to the latter. It is, however, insisted,
that, unacceptable as such result may be in this case, this court is
compelled by controlling decisions to adopt and affirm it. We do
not think this is so. This question, whether additional capital stock
issued by a corporation against accumulated earnings and profits
shall belong to the life tenant or remainder-man, has naturally been
a prolific source of dispute and controversy. In trying to deal fairly
and equitably with it, the courts have been led by different theories,
and varying phases under which the issue was presented, into ir-
reconcilably conflicting opinions. Turning to those decisions which
are controlling, or at least authoritative, there seem to be reasonably
well defined two rules which we may utilize in measuring the rights
of the parties here: First. A corporation with a surplus of accumu-
lated profits, within the limits of good faith, has the power either to
distribute it as dividends, or to retain it and convert it into capital.
Second. The substance and intent of the action of the company, as
evidenced by its treatment of the surplus and its resolutions in issuing
new stock against it, will be considered by, if not controlled, the courts,
in deciding whether such issue is dividend, and hence income belong-
ing to the life tenant, or not. If the company pays money or issues
stock as a distribution of profits, it will ordinarily go to the life ten-
ant. If it issues stock as capital, and appropriates its surplus as an
increase of the capital stock of the concern, such issue will be held to
inure to the benefit of the remainder-man. In re Kernochan, 104 N.
Y. 618, 629, 630, 11 N. E. 149; Gibbons v. Mahon, 136 U. S. 549,
10 Sup. Ct. 1057, 34 L. Ed. 525; McLouth v. Hunt, 154 N. Y. 179,
194, 48 N. E. 548, 39 L. R. A. 230; In re Rogers, 161 N. Y. 108,
55 N. E. 393. There is the other general rule always applicable to
construction under a will,—that we must ascertain, if possible, the
meaning and intention of the testator, to be derived from the lan-
guage employed in the creation of the trust, from the relations of the
parties to each other, their condition, and all the surrounding facts
and circumstances. McLouth v. Hunt, page 190, 154 N. Y., page 548,
48 N. E., and page 230, 39 L. R. A.

We shall endeavor to apply these principles and rules to the facts
of this case. So far as the last one is concerned, it appears that for
years before the testator's death the policy had been pursued by the
defendant company of accumulating its profits; only one dividend

having been paid to him. The surplus at the time of his death was more than seven times greater than its capital stock. While there is no definite finding upon that subject, we may assume from what incidentally appears that the testator and his wife were elderly people. The wife's demands for income were apparently not extravagant or large. This appears from the fact that most of the income which she did receive or become entitled to receive from this stock during her life was passed over to her children. It is difficult for us to believe that, when the testator left the income of this property to his widow, he believed or anticipated that the long-continued policy of the corporation would be immediately reversed, and by a stock dividend several shares of the property which it had at his death passed to the life tenant, as against one which would then be left for his children. As was said in Re Rogers, page 113, 161 N. Y., and page 394, 55 N. E., in accordance with a well-settled policy, then long pursued, of retaining accumulated earnings for working capital, it must "have been within the contemplation of the testator that a reasonable amount would be retained by the directors for this purpose."

The first of the other two rules is too well established to require discussion. It must be admitted at once that if, in the exercise of an honest judgment, the defendant corporation saw fit to permanently capitalize its profits, instead of distributing them in dividends, the life tenant could not force a change of policy. She could not compel dividends if the company saw fit to accumulate surplus.

The second rule seems to flow logically from the first. As long as the corporation has power to decide, for the purposes of its own management, whether it will capitalize or distribute earnings, it is proper that the courts should consider such decision in settling between them the rights of those—remainder-man and life tenant—who are interested in its stock. It perhaps may be granted, for the sake of the argument, rather than held (the question not being here), that this company in 1893 had the power to distribute amongst its stockholders its surplus, and so make it a dividend, and that this court would have felt constrained to treat such dividend as income payable to the life tenant. Upon the other hand, we think it undoubtedly had the power to so capitalize its surplus, and then issue new stock against it, so clearly and explicitly declaring the latter to represent and be an increase of its actual, permanent working capital that no court could fairly say the new shares were a distribution of profits or income. It will be seen that the question addressed to the court in a given case, whether new shares are dividend and income, or increase of capital, must almost necessarily be governed largely by the purpose and attitude and condition of the corporation. This must be so unless every issue of stock against surplus is to be indiscriminately called a "dividend," and treated as income. What was the nature of the stock issued in this case? The learned trial court has said, in substance, that it was issued as a stock dividend, and was a distribution of income upon the original 60 shares. Such finding, however, is a conclusion dependent upon, and governed by, many facts. If, as we think, the detailed facts and circumstances otherwise found do not sustain it, it must yield to them. Phelps v. Vischer,

50 N. Y. 69, 72, 10 Am. Rep. 433; Bonnell v. Griswold, 89 N. Y.
122–127; Rochester Lantern Co. v. Stiles & Parker Press Co., 135
N. Y. 209, 212, 31 N. E. 1018. It is perfectly manifest from its state-
ment and otherwise that the profits accumulated by this corporation
down to the testator's death, and down to the issue of this stock, were
treated as an accretion to capital, and permanently invested in plant
and other assets necessary for the conduct of business. Substantially
none of them were carried in the form of cash. The real estate and
machinery alone upon January 5, 1884, inventoried at $119,832.11,
or practically three times the amount of the authorized capital. It
is perfectly evident, also, that this company could not have done
its business upon a capital of $40,000, but that it was necessary to
accumulate and use a large amount besides. The men who were
in charge of its affairs in 1893, and knew its needs, realized this,
and did not divide up a large portion of this surplus by a cash divi-
dend,—the equivalent, in legal principle, of a stock dividend. In
fact, a very forcible argument as to what the directors did not intend
to do in the way of distributing the surplus in dividends is to be drawn
from what they did do in that respect. They appreciated that the
stockholders were entitled to liberal dividends from the large earn-
ings, and they declared those in cash. A few days before this new
scrip was issued, they paid to the stockholders $80,000 in cash. That
was a dividend, and so intended and declared. Then they issued
stock for $210,000 of surplus, and denominated it, not a "dividend,"
but an "increase of capital." If they had intended to distribute that
amount of surplus, and not keep it for permanent capital, there was
no necessity for taking the two different steps. Read in the light of
these facts and considerations, we think the consent of the stock-
holders and the action of the directors show that they had no inten-
tion to make a dividend, but that they intended by an issue of new
shares to so add to and increase their paper capital that it would
represent and correspond with their actual working capital. We think
the predominating purpose was to permanently increase capital, rather
than to divide up profits. The stockholders' agreement recites that
they "mutually agree with one another to increase the capital stock
of said company," etc. We do not see how they could well express
more plainly the idea of enlarging their capital. It is true, as was
said by the court in the McLouth Case (page 195, 154 N. Y., page
552, 48 N. E., 39 L. R. A. 230), that no money was paid for this
stock, and nothing added to the actual property of the company.
But that is always so when stock is issued, as this was, against a sur-
plus. If money or property is paid for new stock upon a subscrip-
tion, it could not possibly be called a "dividend." Yet it cannot be
doubted that stock may be issued against a surplus as permanent
capital, instead of a dividend, if the corporation so elects. If the
words used, "increase the capital stock," are themselves ambiguous,
they cease to be so when we again recall that such increase was
against an accumulation of assets already in use as working capital,
and which could not be actually distributed as dividend amongst
the stockholders without disrupting its business.

It may be suggested that a stock dividend would not really divide

the assets amongst the stockholders, but would leave them still in the possession of the company. This, however, is not an answer, if we are right that one of the tests by which to determine the question here presented is whether the company intended by this stock issue to make an addition to its permanent principal or capital, rather than distribution of income by cash or stock. We think the construction of the words of the agreement which we have adopted as sustaining the former view is upheld in the Gibbons Case (pages 551, 569, 136 U. S., pages 1058, 1062, 10 Sup. Ct., 34 L. Ed. 525) and in which respect we do not understand that case to be overruled or questioned by the McLouth Case. Moreover, the agreement and resolution referred to are significant for what they omit to say in plaintiff's favor. In the Kernochan Case, relied upon by him, there was a resolution which expressly provided for a dividend at a certain rate per share. Page 627, 104 N. Y., and page 152, 11 N. E. In the McLouth Case the parties actually stipulated that the corporation, "by a capitalization of accumulated earnings made and retained, * * * increased its capital stock, * * * and predicated thereon made a stock dividend of ten per cent.," etc. Thus in both of these leading cases the corporation, having the power to do so, explicitly declared the disputed issue to be a dividend; and, that being done, the court gave it to the life tenant, who was entitled to dividends as income. In Lowry v. Trust Co., 56 App. Div. 408, 67 N. Y. Supp. 759, the court manifestly intended to follow the McLouth and Rogers Cases. There, again, the stock in controversy was issued under a resolution which expressly authorized and directed it as a stock dividend. Further, we think the McLouth Case fairly outlines the doctrine that in each case the court will look into the surroundings and nature of the transaction which produces the stock issue, and adjust the rights of the contending parties according to justice and equity. We do not think that it was intended to hold that every issue of stock against a surplus was income going to the life tenant. There is a manifest difference between a distribution of 10 per cent. upon the capital and an issue of 500 per cent. of stock. We are thus led to conclude that the 300 shares in question were intended to be, and were, issued to represent an accretion to the permanent working capital, long used and recognized as such, and that they were not a dividend from income or profits belonging to the life tenant.

We believe that a defense to this action is also found in the proceedings had in surrogate's court for the settlement of the testator's estate, and in the agreements made and executed between plaintiff and his sisters for the division of the stock in dispute, which were connected with, and in whole or part served as a basis for, such proceedings in surrogate's court. Plaintiff, in seeking here to enforce his claims, assumes the threefold role of assignee of his wife, who, in turn, was his own assignee, of any interest in his father's estate; executor of his mother's estate; specific legatee under her will of this stock. He has no standing in the first character. If this stock belonged to his father's estate, it has concededly been distributed in proper proportions. Measuring his demands by their derivation

through his mother's estate, we think that for the purposes of the discussion, to follow, of the agreements and proceedings above referred to, he must be regarded at the time of their occurrence as having been entitled to this stock as an individual, rather than as executor, if entitled to it at all. He was specific legatee of it. His mother died February 16, 1897, and her will was duly admitted to probate September 25, 1897,—before any of the important steps hereinafter recounted occurred. It very clearly appears that no other legatees or distributees had any interest in this stock. It does not appear that any creditors had any such interest. In fact, it is a very permissible inference from all the facts found in regard to Mrs. Chester that there were no creditors to interfere with plaintiff's specific legacy in the stock. Under such circumstances, his qualified title as executor became merged in his beneficial interest as devisee and legatee; and as such latter, individually, he became vested with the legal title to the stock, if it belonged to his mother's estate. Blood v. Kane, 130 N. Y. 514, 29 N. E. 994, 15 L. R. A. 490. All doubt upon this point is removed by plaintiff's own attitude in this case. He alleges in his complaint that his mother by her will devised and bequeathed all her property and estate to him, and that he "thereby became the owner of the said three hundred shares of stock, and entitled to receive the same."

Having thus defined the character and capacity through which plaintiff must urge his demands, we come immediately to the question whether he could take part, as he did, in the various agreements and decrees which treated of and related to this stock as part of his father's estate, and then, many years afterwards, when those proceedings had long been executed, and the stock divided in accordance with them, obtain an entirely new adjustment upon the ground that the stock did not belong to his father's estate at all, but was part of his mother's. We say very frankly we do not believe he can or ought to. We revert first to the occurrences of September, 1897, when the other executor, Mr. Chard, gave notice, in effect, that he treated this stock as all belonging to Thomas Chester's estate, and proposed to sell it as such, and plaintiff's wife and then assignee took the position, in effect, that such stock did belong to the father's estate, and that, as representative of her husband, she was entitled to one-quarter of it, and requested that such proportion and interest be allotted to her, expressing her willingness that the other heirs (defendants here) should have their similar respective shares. Plaintiff joined in the verification of her petition, and requested "that the prayer of the said petition be granted." It was granted by the acts of the parties, without further proceedings in court. The stock was divided as belonging to the father's estate under the terms of his will, and plaintiff's wife and assignee, by his request and desire, received, and she or he still holds, 90 shares, upon that theory belonging to her. The defendants hold their respective portions, which plaintiff now seeks, by virtue of the same division which gave hers. We think it clear, if this arrangement and division by the parties between themselves was otherwise binding, and, when executed, irrevocable, that plaintiff, who was a party to and requested it, cannot now be allowed

to disrupt and overturn it by a claim through his mother's estate which he then possessed as fully as now, and which he did not then mention or assert.

It is said, however, plaintiff was ignorant of the facts which attended the issue of the 300 shares of stock; also that his sisters parted with no rights upon this division, and that therefore there is nothing to now prevent taking the stock away from them by virtue of a different theory of ownership. We shall consider the first proposition later, saying and assuming for the present that it is not sustained. So far as the second one is concerned, it may be said that such an adjustment as was made may be sustained against a party as well by virtue of gain to him as by loss to those with whom he deals. The executor claimed then, as now, that all of this stock belonged to the estate of Thomas Chester, and was about to sell it. Plaintiff and his wife evidently felt that they might be put to a disadvantage by such sale, and therefore said, "Give up the sale, and let us have our share of this stock, and the others can have theirs." This was done, and we think a sufficient consideration is found in the substitution and mutuality of the transaction to uphold it. We may, however, look at it in another light. If we should assume that the three sisters (defendants here) had absolutely no right to this stock, yet if plaintiff and his wife voluntarily consented, as a matter of pure gift and gratuity, that they should have each a quarter thereof, and such consent and gift was executed, and the stock delivered, we fail to see how plaintiff, except for some legal reason, as fraud or mistake, could thereafter get the stock back from them. After this division was made, plaintiff and his coexecutor, Chard, petitioned to have their accounts as executors and trustees finally settled, and themselves discharged. Their petition recited that they had fully accounted for all the property which had come into their possession. An instrument was executed by all the parties interested, including this plaintiff and his wife, which acknowledged distribution to and receipt by the parties of all property "held by them as such executors and trustees," and consented that they be discharged. Upon this a decree was made by surrogate's court discharging them, the surrogate "being satisfied that the said executors have duly accounted to all the interested parties for their interest in said estate." The scrip for this 300 shares of stock had been issued to, and held and claimed by, the estate of Thomas Chester. This had been made patent to plaintiff, at least, by the letter and attitude of the executor Chard at the time of its proposed sale. The only way it had ever been distributed was as belonging to his estate, and amongst his four children. Therefore, when this decree, founded upon the release and consent of the parties, held that the executors were entitled to be discharged because they had distributed to the persons entitled all the property which had come into their hands, it necessarily adjudicated that the division in question was a proper distribution, for which they should receive credit. If that stock, which indisputably had been issued to this estate, and came into the control of its executors at the time of this decree, belonged to plaintiff, as legatee of his mother, no proper distribution of it had been made, and the decree was improper. We

do not doubt that the surrogate's court had jurisdiction to determine where this personal property belonged, as between the different legatees and their representatives and successors,—whether it went to the life tenant or remainder-men. We also feel equally clear that that was one of the questions necessarily involved in this accounting, and that upon it, unless reversed or annulled in some way, the surrogate's decree was a binding adjudication. Plaintiff was a party to that accounting and decree. He was not only a party to it as an executor and petitioner, but he was named and made a party as one of the persons interested in the estate. He was then vested with just as much right and title as now, by virtue of his mother's will, to all of this stock. If his claim is just now, it was then, and he was entitled to a very different decree from that which was entered. We do not deem it necessary to indulge in any extended reasoning to show that the decree, if binding in favor of the executors, is also a binding adjudication in favor of the different heirs who took the stock from them, and were parties to the decree.

It is, however, strenuously urged in behalf of plaintiff, for the purpose of relieving him from the conclusions which we have drawn from the proceedings above detailed, that he was not cognizant of the facts surrounding the issue of the disputed stock; that he did not know his rights, and was laboring under ignorance; that therefore he is not bound by what took place. The trial court, in a qualified manner, has found for this claim. We are, however, unable to reconcile such conclusion with the detailed facts found, and upon which it would have to rest. Plaintiff knew that Thomas Chester's estate at his death held only 60 shares of this stock. He knew by the letter of his coexecutor, if not otherwise, before any of the steps or proceedings now invoked against him were taken, that this holding had increased to 360 shares, and that the estate of Thomas Chester held and claimed them. As an executor, he must be charged with knowledge that the estate had not expended a large sum of money in buying these additional shares. He knew that a corporation could not at will multiply the number of its capital shares, but that it must have some assets against which they were issued. He knew that, when the corporation issued these additional shares without receiving money for them, it must necessarily have issued them against an accumulated surplus of profits over and above the amount of its original capital. The fact that he had taken part in inventorying the original 60 shares at $850 per share, instead of par, at least ought to have suggested to a person of average experience that the company was putting its surplus into an increase of its shares. When he knew all these things, he was charged with sufficient knowledge to suggest the legal inquiry whether such new stock was income, and belonged to him, as his mother's legatee. He may not have thought about this question, or, if he did, he may have thought differently than he does now. But that is not sufficient to relieve him from the consequences of what was done, if he was fairly apprised of the facts. There is no evidence that any effort was made to keep him in ignorance or mislead him. There is nothing in the record of the litigation presented to us which makes us believe that these parties were led astray through too much mutual

confidence, or that plaintiff was slow to see or assert his rights in this estate. In April, 1898, and thus many months before the surrogate's decree, plaintiff's wife called upon the defendant corporation, under the statute, for a detailed, verified statement of its affairs, which was furnished to her. We have no idea that plaintiff was a stranger to this step, or that, with his attorneys to guide him, he felt unable to secure more information upon this subject, if he desired it. We are impressed, upon all of the facts as they are unfolded in the findings, that the difference between plaintiff's attitude in 1898 and now is not due to his having been then disabled by ignorance of the essential facts. It is more probably due to the conclusion which has come to him since,—that upon those facts, known then as now, it might have been possible for him to have obtained more stock.

The conclusions reached upon the main proposition carry with them a decision of the other minor and incidental questions involved in the case. The judgment appealed from should be reversed, with costs to the appellants to abide event.

Judgment reversed, and new trial ordered, with costs to appellants to abide event. All concur, except WILLIAMS, J., who dissents in opinion.

WILLIAMS, J. (dissenting). The interlocutory judgment appealed from should be modified as hereinafter stated, and, as modified, affirmed, with costs to respondent against appellants other than the corporation, and with costs to the corporation appellant against respondent. The action was brought to determine the ownership of 225 shares of the capital stock of the defendant corporation, and for equitable relief incidental to such ownership. The questions involved may be stated generally to be (1) whether the stock was at any time owned by the plaintiff or the widow, his mother; and (2) whether anything has occurred since to deprive them of such ownership, or to prevent plaintiff's recovery thereof. The facts are somewhat complicated, and should be clearly understood. There was no case, or case and exceptions, made or inserted in the record, and I must therefore be controlled by the decision of the trial court as to the facts upon which the conclusions of law were based.

One Thomas Chester died February 18, 1884. At the time of his death, and for some time prior thereto, he was the owner of 60 shares of the capital stock of the defendant corporation. The capital stock was then $40,000, divided into 400 shares, of $100 each. He left, him surviving, his widow, Mary P. Chester, and four children,—the plaintiff, George T. Chester, and Elizabeth Chard, Kate C. Miller, and Cora C. Tripp. He left a will whereby he gave to each of his three daughters $20,000, and to his son a bond and mortgage for $40,000, made by the son, and held by the father, and then gave his widow all the residue of his estate, real and personal, for her use and benefit during life, and after her death in fee to his four children, to be divided equally between them, and made his son and son-in-law James F. Chard executors. The will was admitted to probate April 18, 1884, and letters testamentary were issued to the executors named, who qualified and entered upon the discharge of their duties. On the 29th

day of December, 1884, the certificate for the 60 shares of capital stock of the defendant corporation was surrendered by the executor Chard to the corporation and canceled, and a new certificate for said 60 shares was, by the procurement of said executor Chard, issued to the estate of Thomas Chester. On the 14th day of January, 1893, the capital stock of the defendant corporation was increased from $40,000 to $250,000,—from 400 to 2,500 shares. Of the 2,100 shares newly issued, 100 shares were set aside as treasury stock, and 2,000 shares were divided pro rata among the holders of the old stock; that is, 5 shares of new for each share of old stock. On the 28th day of February, 1893, the corporation issued a certificate for 300 shares of the newly issued stock to the estate of Thomas Chester, based upon its holding of 60 shares of the old stock. The widow, Mary P. Chester, died February 16, 1897, leaving a will whereby she gave all her interest in the capital stock of the defendant corporation to the plaintiff, George T. Chester, and made him executor. The will was admitted to probate September 25, 1897, and letters testamentary were issued to the executor named, who qualified and entered upon the discharge of his duties.

Before proceeding further with the statement of facts, let us understand the claims made by the parties as to the first question involved herein,—the original ownership of the stock, old and new. There is no dispute but that the 60 shares held by the father at the time of his death was a part of the corpus of his estate, and at the death of the widow belonged to all the children,—one-fourth to each. The controversy arises over the 300 shares of newly issued stock. The plaintiff claims these shares never belonged to the corpus of the estate, but were income from the estate, and as such belonged to the widow absolutely, and passed under her will to the plaintiff absolutely. Of the 360 shares of stock, the plaintiff was concededly the owner of 15 shares of the old stock and 75 shares of the new stock. The question is whether he was the owner of the remaining 225 shares of the new stock, and this involves the question whether the 300 shares of new stock, when issued, belonged wholly to the widow, as income, or to the corpus of the estate, to the income from which alone she was entitled during her life. The further facts bearing upon the determination of this question are as follows: The only dividend received by Thomas Chester upon the 60 shares of stock during his lifetime was February 7, 1882,—$1,500. A large surplus of earnings was allowed to accumulate, which at the time of his death amounted to $289,341.88. The value of the stock at the time of his death was $850 per share,— in all, $51,000,—as appraised in the inventory of the estate, based upon the last yearly statement made by the defendant corporation. The dividends received by the widow, Mary P. Chester, upon the 60 shares of stock from the time of her husband's death until the increase of the capital stock, in January, 1893, were: April 15, 1884, $1,500; October 9, 1884, $3,000; October 3, 1885, $3,000; November 1, 1886, $6,000; December 5, 1887, $1,500; August 20, 1888, $6,000; August 22, 1888, $6,000; August 31, 1888, $6,000; December 30, 1888, $7,050; September 16, 1889, $1,500; January 27, 1891, $1,500; January 30, 1892, $6,000; January 11, 1893, $12,000; making in all, for

the nine years, $61,050. And at the time of the increase of the capital stock the surplus of earnings allowed to accumulate were $443,030.51, —an increase during the nine years since the death of Thomas Chester of $153,688.69. After deducting the amount of the stock dividend made in increasing the capital stock, $210,000, the surplus earnings still on hand were $233,030.57, which was $56,311.31 less than at the time of Thomas Chester's death. The dividends received by the widow Mary P. Chester, from the time of the increase of the capital stock, in 1893, until her death, in 1897, upon the 360 shares of stock, were: December 28, 1893, $7,200; January 10, 1895, $7,200; September 25, 1896, $18,000; making in all $32,400. And at the time of her death the surplus of earnings allowed to accumulate was $362,006.29,— an increase during the four years of $128,975.63. These figures show that during the lifetime of the widow, and after her husband's death, she received, in all, of cash dividends on the stock,—the 60 shares of old and 300 shares of new,—$93,450. There was also the stock dividend of 300 shares, or $30,000, at $100 per share; and there was during the time a total increase of the surplus earnings from $289,-341.88 to $362,006.29,—that is, $72,664.41. After the death of the widow, Mary P. Chester, and February 4, 1892, there was a dividend of 40 per cent. paid upon the stock of the defendant corporation, which upon the 360 shares belonging to the parties to this action amounted to $14,200. And then in the month of February, 1899, the corporation sold out all its property, except bills and accounts receivable and cash, for $553,861.71, and went into liquidation. It has paid certain liquidation dividends to its stockholders. The dividends upon the 360 shares have, however, been deposited in the Fidelity Trust Company of Buffalo, N. Y., to the amount of $79,200, to await the result of this action. There will be added to this amount of deposited dividends about $3,366, less some expenses of liquidation.

The plaintiff, George T. Chester, knew nothing of the increase of the stock and the issue of the 300 new shares until after the death of the widow, his mother, Mary P. Chester. Whether she knew of it, does not appear. In August, 1886, the widow and the plaintiff and Mrs. Chard and Mrs. Miller, by a writing executed by them, directed the executors of the estate to divide all moneys received by them from the defendant corporation from the date of such writing to January 1, 1889, belonging to the estate, equally between the four heirs,—Mrs. Chard, Mrs. Miller, Mrs. Tripp, and George T. Chester, the plaintiff. All the dividends received from the defendant corporation upon the 60 shares of stock from the time of the death of Thomas Chester until the increase of the capital stock were, with one exception, divided among the four children, by the direction of the widow; and all the dividends received upon the 360 shares of stock after the increase, and up to the time of the widow's death, were also divided among the four children, by direction of the widow. Whether the writing above referred to was relied upon as such direction, or whether there was other direction, does not appear. It does appear that by a writing made by the widow February 27, 1888, she stated that she had always regarded the executors named in the will as trustees of her husband's estate, for her benefit, and that she had always dealt with

them as such,—she being thus relieved personally of the charge and management of the estate,—and asked that their accounts be settled before the surrogate, the same as if the will had expressly made them such trustees for her benefit during her life, and that the executors thereafter act as such trustees. And thereupon the settlement was made and decree entered April 17, 1888, upon a petition filed February 29, 1888. And in such petition and settlement the writing of August, 1886, was recognized, as signed by all the four heirs, though the name of Mrs. Tripp does not appear signed to the writing in the record of the findings by the trial court. The executor James F. Chard was prior to the death of Thomas Chester a trustee of the defendant corporation, and secretary thereof, and continued to be such trustee and secretary until the death of the widow, while the plaintiff, George T. Chester, was at no time a trustee or officer of the corporation. After the settlement of the estate above referred to the executors continued to hold the stock of the defendant corporation, with the consent of the widow and all the next of kin,—the four children. When the certificate for the 300 shares of newly issued stock was made out, it was to the estate of Thomas Chester, and was delivered to the executor James F. Chard. Under these circumstances, we can hardly assume, in the absence of an express finding to that effect, that the widow had actual knowledge of the issue of the 300 shares of new stock, and that it was issued in the name of the estate, and not in her name. The findings are that she received all the dividends from the old and the new stock, but this is rather a conclusion than otherwise. The real fact, apparently, was that the executor Chard, who acted for her, and who had sole charge of this part of the business, as trustee or otherwise (because the plaintiff had no knowledge of the increase of the stock), received all the dividends, and divided them; and there was no more reason why the widow should inquire and know that the dividends were on 360, rather than on 60, shares of the stock, than that the plaintiff should. She had no personal charge or management of the business. She had imposed such care and management upon the executors, as trustees, or otherwise. There was more reason why the plaintiff should know about the increase of stock, and form of the new certificate, than the widow. Finally, as bearing upon this branch of the case, the court has found as a fact that the 300 shares of new stock represented, and was a payment and distribution of income upon and from, the 60 shares of stock owned and possessed by Thomas Chester at his death, but it is not found whether such income was earned before or after the death of Thomas Chester. These seem to me to be all the facts bearing upon the first question involved here,— the original ownership of the 300 shares of newly issued stock.

I think it is now well settled in this state, as a general rule, that, as between a tenant for life and remainder-men, stock dividends belong to the life tenant, if made during the life tenancy, though from earnings accumulated wholly or in part before such tenancy commenced. In Riggs v. Cragg, 89 N. Y. 487, it was said that this question had not then been considered by the court of last resort in this state, and it was not passed upon in that case. The question seems first to have been considered by the court of appeals in the case of In re Kernochan,

104 N. Y. 618, 11 N. E. 149. The will there gave to the executors portions of the estate in trust to receive the rents, interest, and income, and apply the same to the use of the widow during life, remainder to the beneficiaries named. The trust fund included certain shares of stock, upon which a dividend was declared after the death of the testator, in part from earnings accumulated before his death. It was held that the widow was entitled to the whole of the dividend; that, whether the earnings were accumulated before or after the death of the testator, they were not profits accruing to or owned by the stockholders, unless set apart by the corporation for their use, and they belonged to the widow, because ascertained and declared after her husband's death. The court below had apportioned to the beneficiaries that portion of the dividend earned before the death of the testator, and to the widow that portion earned after such death, thus applying a rule said to be founded on general equity, viz.:

"That when a fund is given for life to one beneficiary, and remainder over, the first shall have its earnings after the life tenancy begins, and the remainder-men the balance."

Judge Danforth, however, said:

"I find nothing in the will which indicates that the testator intended any such investigation or division, or that any other than the ordinary rule which gives cash dividends from accumulated earnings or profits to the life tenant should be applied. The direction to his executors is to receive the rents, interest, and income of his estate, and apply the net amount of such rents or other income * * * to the use of his wife. From the shares in question no income could accrue, no profits arise, to the holder, until ascertained and declared by the company, and allotted to the stockholders; and that fact should be deemed to have been in the mind of the testator, and not the earnings or profits, as ascertained by a third person, or a court upon investigation of the business and affairs of the company, either upon an inspection of their books or otherwise."

In McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, 39 L. R. A. 230, the residuary estate was, by a will, given to his executors in trust, to "take, hold, care for, preserve, maintain, invest, reinvest, convert, sell, lease, and collect the same," and pay over a portion of such income to the use and benefit of his grandsons, respectively, during their minority, and after arriving at the age of 21 years to pay over to them the full income, and upon their arriving at the age of 35 years the full amount of principal, with any accumulations thereon, remaining; and, in case of death before arriving at the age of 35 years, the fund was given to other persons in fee. The testator died September 18, 1888. There were included in the trust estate 254 shares of Western Union Telegraph Company stock, upon which a stock dividend of 10 per cent. was declared November 10, 1892, upon the surplus earnings of the telegraph company accumulated during the 10 years prior thereto. The court, among other things, was asked to determine whether this stock dividend belonged to the life tenants, so called, or to the remaindermen,—whether it was income, or part of the corpus of the estate. The trial court held the dividends belonged to the life tenants, and they were entitled to the same as earnings or income, and the court of appeals affirmed that decision. Judge O'Brien, writing for the court, considered all the cases in this state

and elsewhere, and arrived at the conclusion that the decision made
by the court below was equitable and just, and was supported by rea-
son and authority. It is apparent the surplus earnings from which the
dividend was declared were accumulated a part before and a part after
the death of the testator. The opinion was certainly based upon such
an understanding of the facts, because Judge O'Brien states therein
that:

"The resolution recites that the earnings of the corporation had been
withheld from the shareholders for almost ten years, and that they had ac-
cumulated, and that it was the intention of the directors, in taking such
action, and the shareholders, in consenting to it, to distribute such accumu-
lated earnings to the shareholders in the form of stock certificates, instead
of money."

In Re Rogers, 161 N. Y. 108, 55 N. E. 393; Id., 22 App. Div. 428,
48 N. Y. Supp. 175,—the will created trusts for the benefit of testator's
children during their lives, with remainder to their issue. In the trust
fund were shares of stock in a corporation. The testator died August
25, 1888. The corporation continued in business until 1893, paying
yearly dividends,—at first of 10 per cent., and later of 20 per cent.
Then it sold its plant, with raw material and that in process of manu-
facture, for $2,750,000, to be paid for in the stock of a new corporation.
The stock of the new company was divided among the stockholders of
the old company in the proportion of 10 shares of the new stock for
1 of the old. The old corporation had still other property, of the
value of $3,000,000, and the corporation sold this property, and dis-
tributed the proceeds among its stockholders. The question was as
to the rights of the life tenants and remainder-men in the new stock
and proceeds of the other property sold. The referee before whom
the case was first heard held that the whole fund was to be treated as
capital, or part of the corpus of the trust estate, and that the life ten-
ants were entitled to no share in it. The surrogate modified the re-
port of the referee, holding that 100 per cent. of the cash dividend and
the dividends of the new stock were capital, and that the remainder
were profits or income, to which the life tenants were entitled. The
decision of the surrogate was affirmed in the appellate division and
in the court of appeals. The case was decided in the appellate division
in November, 1897,—the next month after the decision of the court
of appeals in McLouth v. Hunt, above, which was in October, 1897.
No reference was made by the appellate division to the McLouth-
Hunt Case, and we assume, therefore, the latter case was not brought
to the attention of the appellate division in the Rogers Case. Justice
Cullen did, however, say in the Rogers Case:

"While the corporation continues to do business,—as is sometimes said,
is a going concern,—the law is settled in this state that a cash dividend is
income, and goes to the life tenants, no matter at what time the profits from
which the dividend was declared may have accrued or have been accumu-
lated." Citing the Kernochan Case, 104 N. Y. 618, 11 N. E. 149, above.

In view of the McLouth-Hunt Case, I must add that the same is
true of a stock dividend, as of a cash dividend. The appellate di-
vision, however, held that the rule stated had no application to the
Rogers Case, where there was no dividend by a going corporation,

but a division made of the assets of a liquidating corporation among its stockholders.   Later in his opinion, Justice Cullen says:

"Had the company, before transferring its plant to the new corporation, distributed this whole surplus or reserve fund among its stockholders, it would have gone to the life tenant, and no well-founded complaint could have been made that such a distribution was either illegal or inequitable."

It further appears from the opinion of the appellate division that the life tenants took no exceptions and made no objection to the decision of the surrogate, so far as it held a portion of the fund was capital and belonged to the remainder-men.   The case cannot, therefore, be regarded as an authority, so far as the appellate division or court of appeals is concerned, for the proposition that any part of the fund was capital, and belonged to the remainder-men.   No authorities were cited by the court of appeals in its opinion, the only reference thereto being the statement that the cases to which their attention had been called furnished but little aid in the determination of the question presented under the peculiar facts of the case.   The appeal to the court of appeals was by the remainder-men alone.   The life tenants did not appeal.   This case, therefore, cannot be said in any way to have modified or overruled the former decision of the court in the McLouth-Hunt Case.   It may be further noted that the appellate division in the First department in December, 1900, followed the law as laid down in the McLouth-Hunt Case in Lowry v. Trust Co., 56 App. Div. 408, 67 N. Y. Supp. 759, and held that a stock dividend declared out of undivided profits or surplus, a portion of which was earned before the testator's death, upon stock of a corporation set apart by a trustee of a trust fund created by a will, belonged to the life beneficiary of the trust, and not to the remainder-men.   In the case we are considering it does not appear when the surplus earnings were accumulated from which the stock dividend was made,—whether before or after, or both before and after, the death of the testator. There was a surplus at the death of $289,341.88, and at the time this dividend was made this surplus had increased to $443,030.57.   The dividend was $210,000.   The whole of it may have been made from the surplus accumulated before the death.   The whole of it could not have been made from the surplus accumulated after the death, because the surplus so accumulated was only $153,688.69.   It was made from the whole surplus accumulated up to the time it was made, without any limitation to that accumulated during any particular time.   In any event, under the authorities we have referred to, the 300 shares of new stock issued upon the 60 shares of old stock owned by the estate belonged to the widow, and the children had no interest therein.

I have very carefully considered the suggestions of counsel for the appellants, and I find no justification for any different result growing out of the language of the will in question, or the facts found by the trial court.   It is suggested that in the McLouth-Hunt Case the language of the will was peculiar, in that it provided that the executors should pay the life tenants "the full income"; but this language was used because it had already been provided that, prior to the life tenants coming of age, only portions of the income were to be paid to them, and then followed the provision that from the age of 21 to 35

the full income should be so paid. This language could have no bear-
ing upon the testator's intention with reference to disposition of any
dividends upon the 60 shares of stock made after his death. The re-
marks of Judge Danforth in the Kernochan Case, above quoted, are
quite applicable here. I find nothing in the will, or in the condition
of the property or of the widow and next of kin, indicating any inten-
tion on the part of the testator to take this stock dividend out of the
ordinary rule which gives the whole of it to the life tenant, to the ex-
clusion of the remainder-men. There is no basis for any claim that
the widow assented or admitted that the new stock belonged to the
estate, by permitting the certificate to be taken to, and the stock to
stand during her whole lifetime in the name of, the estate. It does
not appear that she had any knowledge or information as to the form
of the certificate, or that the stock stood in the name of the estate.

My conclusion is that the 300 shares of new stock belonged to the
widow from the time they were issued until her death, and the children
had no interest therein. At her death the stock, under her will,
passed to her son, the plaintiff, George T. Chester. The remaining
question is whether anything has occurred since the death of the
widow which deprives the plaintiff of the present ownership of the
stock, or prevents his recovery of the same.

As already stated, the widow died February 16, 1897, but her will
was not admitted to probate until September 15, 1897. At some
time prior to September 30, 1897 (just when does not appear), the
plaintiff assigned and transferred to his wife, Helen R. Chester, all his
interest in his father's estate, and this assignment covered and included
whatever interest he had in the 360 shares of stock as residuary legatee
under that will. It did not cover or include whatever interest he ac-
quired in the 300 shares of stock by his mother's will. September 6,
1897, James F. Chard, plaintiff's coexecutor under the father's will,
wrote the plaintiff that the estate owned 360 shares of stock in the de-
fendant corporation, and that, as all parties desired the estate matters
settled and adjusted, he, as executor and trustee, would offer all the
interest of the estate in such stock for sale, to the highest bidder,
on the 4th day of October, 1897. Thereafter, and September 14,
1897, Helen R. Chester presented to the surrogate a petition wherein
she stated the facts necessary to enable her to secure the relief asked
for, which already appear, and need not be again repeated here, and,
among other things, stated that the executors held the 360 shares of
stock, and that she, as her husband's assignee, was entitled to 90
shares thereof; and she asked that the stock belonging to her might
be delivered to her, and not sold. As a result of this application, with
the assent of all the parties, the certificate for the 300 shares and the
certificate for the 60 shares of stock were surrendered up to the corpo-
ration and canceled; and September 30, 1897, four new certificates, of
90 shares each, were issued,—one to Helen R. Chester, and one to
each of the three daughters of Thomas Chester,—and the proceeding
before the surrogate was discontinued. The plaintiff assented to this
division of the stock. It was while Helen R. Chester held this stock
that the 40 per cent. dividend was paid; February 4, 1898, she receiv-
ing on the 90 shares $3,600. On the 20th day of January, 1899, she

assigned and transferred to her husband, the plaintiff, all her right, title, and interest in the property and stock of the defendant corporation. This action was commenced January 31, 1899. It does not appear when the plaintiff first claimed the whole 300 shares of stock under his mother's will, except that it was prior to the commencement of this action. It is apparent that neither the plaintiff nor his wife supposed, when the stock was divided between the four parties, that such a division was other than in accordance with the real rights of the parties. Just how much information they had as to the facts connected with the issue of the 300 shares of stock, it is impossible to say. They evidently were not informed as to the law, if they were as to the facts. No question was made as to the division being in accordance with the strict legal rights of the parties until just before the commencement of this action. There was no disagreement, no controversy as to the real rights of the parties in the stock, at the time the division was made. That being so, I am unable to see how there was any compromise or settlement of any controversy, or any consideration for the assent or agreement by plaintiff or his wife to divide the stock, giving each party 90 shares, or any estoppel preventing the plaintiff from recovering his stock, and the dividends paid and unpaid thereon since the death of his mother. It would seem that all the parties supposed that the 300 shares of stock belonged to the estate of Thomas Chester, and acted upon that theory. Even if the facts were fully known, the law applicable to the facts was not understood, as the court has since held it to be. In the absence of any consideration for the division,—even a consideration growing out of a compromise or settlement of a disputed controversy,—I am unable to see how the fact of the division of the stock has operated to deprive the plaintiff of the interest he would otherwise have therein.

Much litigation was had between the parties to this action, other than the defendant corporation, as to matters growing out of their interests in the residuary estate of Thomas Chester, and the business of the old firm of Thornton & Chester, of which Thomas Chester was a member at the time of his death, and which was continued during the lifetime of the widow; and there was also a contest of the will of the widow and mother, Mary P. Chester. None of these litigations, however, in any way related to or involved the interests of the parties in the stock in question, unless it was the contest over the will of Mary P. Chester, and the parties did not evidently regard that contest as in any way affecting their rights in the stock. Finally, November 14, 1898, there were papers and writings executed between the parties settling their differences and litigations, except one action that was particularly specified; and then it was provided that it was expressly understood and agreed that none of the papers, nor all of them together, should be construed to release any claims between the parties, except those expressly enumerated. No claim had then been made or suggested as to this stock in question, and no such claim was enumerated in the writings and agreements constituting the settlement thus made between the parties. The controversy in this action was not, therefore, settled by any express agreement made at that time. It was not in the minds or within the contemplation of the parties.

75 N.Y.S.—29

Under these circumstances, I am unable to see how any estoppel as to this claim by plaintiff of an interest in this stock could arise. The consent to the discharge of the executors of the estate of Thomas Chester in no way affected this claim. No relief is sought against them. No remedy against them in behalf of the defendants, the three daughters, as to this stock, was lost by this discharge. The 300 shares of stock never belonged to the estate, but to the widow. The executors never dealt with this stock so as to render them liable to the daughters of the testator in any way. The plaintiff now makes no claim and asks no relief against his coexecutor. Such coexecutor is not a party to the action. More than this, these shares of stock were surrendered by the coexecutor of plaintiff and canceled, and the new certificates for 90 shares each were issued, by consent of all the parties. No further claim could, therefore, be made against him on account of such stock by any of the parties. The claim here sought to be enforced is not one against the estate or its executors, but against the three daughters of the testator, who have received a portion of the 300 shares of stock which never belonged to the estate nor to them at all, but which has been received by such daughters without legal right, and without their paying any consideration therefor. I am unable to perceive any reason why such claim should not be enforced, and the judgment, so far as it affords relief against them, should not be affirmed.

The corporation whose capital stock is in litigation is also a party to the action. It was a necessary party for various reasons. The court, however, erroneously directed judgment in favor of the plaintiff and against the corporation itself for $9,000,—the dividends upon the stock of plaintiff paid to the three daughters after the certificates of stock had been issued to them, and before the corporation had gone into liquidation, or had any notice of plaintiff's claims to the stock,— and also for costs of the action. This relief was granted upon the theory that the dividends were wrongfully paid to the daughters. It is said that the corporation, knowing all the facts, was bound to know the law, and therefore knew that this 300 shares of stock belonged to the plaintiff, and the daughters had no interest therein. The stock, however, stood upon the corporation's books in the name of the three daughters, and they held their certificates with the assent, and, it may be said, by the procurement of, the plaintiff and his wife. She commenced the proceeding to procure the division of the stock, and the plaintiff added his affidavit to his wife's petition, swearing to the truth thereof, and stating his desire that the petition be granted. Thereupon the daughters and plaintiff's coexecutor acceded to the desire of plaintiff and his wife, the proceeding was dismissed, and the division was made, upon consent of all the parties. How could the corporation do otherwise than pay the dividends as it did? It was not a wrongful payment. No matter who were the legal owners of the stock, all the parties directed its division as it was divided, and assented to the payment of the dividends in accordance with such division, and such payment relieved the corporation from all liability to respond again for such dividends. The payment of the dividends to the daughters was not wrongful, and the judgment, so far as it pro-

vided for a recovery of the dividends from the corporation and for costs, was erroneous, and should be modified and corrected.

My conclusion is, therefore, that the judgment appealed from should be modified by striking therefrom all provisions to the effect that the defendant corporation wrongfully issued certificates of stock to the other defendants, and wrongfully paid dividends thereon to such other defendants, and that plaintiff have personal judgment and execution against such defendant corporation therefor, with interest and costs, or for any other amount, and, as so modified, affirmed, with costs to the respondent against the appellants other than the corporation, and with costs to such corporation appellants against the respondent.